# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF PENNSYLVANIA

BUTCH-KAVITZ, INC., et al.,

                    Plaintiffs

          v.

MAR-PAUL COMPANY
INCORPORATED, et al.,

                    Defendants

CIVIL ACTION NO.3:14-CV-00159

(MEHALCHICK, M.J.)

## MEMORANDUM

On January 30, 2014, Plaintiff Butch-Kavitz, Inc. ("Butch-Kavitz"), brought this action under the Miller Act against Defendants Mar-Paul Company, Incorporated ("Mar-Paul"), and its surety Western Surety Company,[1] for the alleged failure of Mar-Paul to pay for work performed and equipment furnished for a construction project commissioned by the United States Army Corps of Engineers (the "USACE") for renovations to Building 12 of the Tobyhanna Army Depot, located in Tobyhanna, Pennsylvania. Specifically, Butch-Kavitz brings a claim for breach of contract in an amount in excess of $121,080.00 for the material and labor provided in completing the electrical and generator work on the project site as required by a Subcontract Agreement executed between Butch-Kavitz and Mar-Paul.[2] Mar-Paul disputes

---

[1] Butch-Kavitz has not only brought this action in its own name, but also brings this action in the name of the United States of America for its use and benefit because, in addition to its state law claims, it seeks to recover on a federal contract under the Miller Act, 40 U.S.C. § 3131, *et seq.*

[2] Additionally, Butch-Kavitz seeks interest and penalties under the Pennsylvania Contractor and Subcontractor Payment Act. 73 P.S. § 501 *et seq.*

these claims on the basis that Mar-Paul paid Butch-Kavitz for the work that was performed in accordance with the terms of the Subcontract, which expressly provided that all payments were subject to approval by the USACE. Moreover, Mar-Paul has counterclaimed for breach of the Subcontract Agreement in the amount of $17,866.36, representing excess costs, expenses, and damages for Butch-Kavitz's abandonment of the project site prior to completing the work.

A non-jury trial was held on May 14 and May 18, 2015. Both parties were represented by counsel at trial, and both parties filed proposed findings of fact and conclusions of law following trial. Based on these submissions, the Court has distilled three main issues requiring resolution; namely: (1) an ultimate determination of the Subcontract Price, accounting for the numerous changes to the Project; (2) whether Mar-Paul defaulted on its payment obligations, thus entitling Butch-Kavitz to terminate the remainder of its contractual obligations; and (3) the amount of damages recoverable pursuant to the Subcontract Agreement.

The Court, having heard the testimony and reviewed all documentary evidence, now enters the following Findings of Fact, Conclusions of Law and Decision pursuant to Rule 52 of the Federal Rules of Civil Procedure. Fed.R.Civ.P.52.

## FINDINGS OF FACT

The following findings of fact are based upon the stipulation of the parties, as well as the testimony and evidence that the Court found credible as presented at trial.

## I.   BACKGROUND

1. The Plaintiff and Counterclaim-Defendant is Butch-Kavitz Inc. ("Butch-Kavitz"), a Pennsylvania corporation with its principal place of business at 624 Fellows Street, Scranton, Pennsylvania 18504. It is engaged in the business of electrical contracting.

2. The Defendant and Counterclaim-Plaintiff is Mar-Paul, a Pennsylvania corporation with its principal place of business at 1335 Senator Robert Mellow Drive, Jessup, Pennsylvania 18424. It is engaged in the business of general contracting.

3. The Defendant Western Surety Company is an insurance corporation organized and existing under the law of the state of South Dakota, with offices at CAN Plaza, 333 South Wabash Avenue, Chicago, Illinois 60604. It is engaged in business as a surety in the Commonwealth of Pennsylvania.[3]

4. On May 12, 2011, the United States Army Corps of Engineers ("USACE") awarded Contract No. W912BU-11-C-0012 (the "Principal Contract") in the original principal amount of $3,381,000.00 to Mar-Paul for renovations to Building 12 of the Tobyhanna Army Depot. (Defendant Ex. 1).

5. On June 21, 2011, Mar-Paul entered into a written Subcontract Agreement with Butch-Kavitz in the amount of $452,000.00 to perform the electrical and generator work in connection with the project.

## II.   SCOPE OF THE WORK UNDER THE SUBCONTRACT AGREEMENT

6. In addition to the Subcontract Agreement, the parties' contractual relationship was expressly governed by the Principal Contract between the USACE and Mar-Paul, the drawings and specifications, and "any other contract documents applicable thereto, including those set forth in Attachment A." (Subcontract Agreement Ex. 5, at 2).

---

[3] As required by the Miller Act, 40 U.S.C. § 3131 *et seq*, Western Surety Company, as surety, executed and delivered to the United States a Payment Bond on behalf of Mar-Paul, as principal, on May 17, 2011, for the protection of all persons furnishing labor and materials in carrying out the work provided for in the Principal Contract. 40 U.S.C. § 3131(b)(2).

7. Specifically, pursuant to Attachment A incorporated into the written Subcontract Agreement, Butch-Kavitz agreed to "perform all work required by the . . . listed plans, drawings and specifications, together with all construction and other activities traditionally recognized as the work of the subcontract trade or discipline assigned to Subcontractor and required by any or all of the plans, drawings, specifications and other contract documents which form the Principal Contract." (Subcontract Agreement Ex. 5, at 13).[4]

8. At the request of Butch-Kavitz, the Subcontract Agreement expressly excluded "excavation, backfill and concrete" from the scope of the Work. (Subcontract Agreement Ex. 5, at 3; Doc. 35, at 65).

9. Aside from "excavation, backfill and concrete," there were no other exclusions of electrical work in the Subcontract Agreement.

### III.   APPROVED ADDITIONS AND CHANGES MADE BY USACE AND MAR-PAUL

10. The Subcontract Price of $452,000.00 was subject to additions and deductions as provided in the Subcontract Agreement.

11. Paragraph 15 of the Subcontract Agreement states the following with respect to changes made to the Project:

15.   **Changes.** Contractor reserves the right either before commencement of the Work or during the progress of the Work or both, to make changes to the Work included in this Subcontract. No additions, deductions or other changes shall be made in the Work, nor shall there be any charges for premium time, except upon written order of an authorized representative of Contractor. Said

---

[4] Paragraph 1 of the Subcontract Agreement incorporates by reference the terms and conditions set forth in the Principal Contract.

4

order shall specify the amount of additional compensation or credit, if any, to be applied to the Contract Price, and the amount of each such change shall be determined as follows:

> (a) If a change is made pursuant to the change order provisions of the Principal Contract, the amount of adjustment for additional Work shall be same as Owner adds to Contractor's price for the additional Work performed by Subcontractor, excluding such sum as Owner may have included or added for Contractor's overhead and profit; and the amount of adjustment for omitted Work shall be the same Owner deducts from Contractor's price for the Work Subcontractor was directed to omit, unless this Subcontract otherwise provides, or the parties mutually agree upon other terms.

(Subcontract Agreement Ex. 5).

12. Shortly after Butch-Kavitz entered into the Subcontractor Agreement, the USACE made numerous design and engineering changes to the project. As a result, Butch-Kavitz was asked to complete additional electrical work in connection with those changes.

   a. *TMDE Restroom*

13. On May 7, 2012, at the request of the USACE and Mar-Paul, on the basis of revised drawings furnished to Butch-Kavitz, Butch-Kavitz submitted a written proposal to Mar-Paul in the amount of $18,630.00 for the electrical work associated with the engineering changes required for the TMDE restroom. (Defendant Ex. 11; Defendant Ex. 12).

14. On September 13, 2012, the USACE issued Modification No. P00004 to Mar-Paul, increasing the amount of the Principal Contract by $450,764.38 to account for the TMDE restroom addition. (Defendant Ex. 13).

15. On September 17, 2012, Mar-Paul signed Modification No. P00004. (Doc. 25, at 118).

5

16. On November 13, 2012, Mar-Paul forwarded Butch-Kavitz a Subcontract Change Order, increasing the Subcontract Price in the amount of $18,630 for the electrical work associated with the TMDE restroom addition. The Subcontract Change Order was subsequently signed by both Butch-Kavitz and Mar-Paul. (Defendant Ex. 13).[5]

17. Butch-Kavitz began the electrical rough-in work for the TMDE restroom on January 23, 2013, but did not complete the work. (Defendant Ex. 8; Doc. 35, at 123).

   *b.   Security Door Hardware (CT-014 & CT-018)*

18. On October 11, 2012, the USACE requested a proposal from Mar-Paul for "CT018 DLA Security and IT Revisions." Specifically, the USACE directed Mar-Paul to complete the following:

> . . .
>
> 2. The outlets on the east wall of the Secure Storage Room 127 shall be revised so that it will be included on the back-up power circuit.
>
> 3. Install low voltage wiring to the card readers and other ESS components. The contract calls for the installation of conduit, junction boxes, and pull string. This change adds installing the required low voltage wiring for the card readers and ESS components.
>
> 4. Revise the power requirements for the IT Server Room 124 for the (4) dedicated 120v/20a circuits for the (4) equipment cabinets be changed to (4) dedicated 120v/30a circuits.
>
> (Defendant Ex. 16, at 1).

---

[5] The parties are in agreement concerning the amount of the increase for the TMDE restroom addition. However, the parties dispute the amounts charged for the remaining changes.

19. On November 21, 2012, the USACE requested a proposal from Mar-Paul for "Change CT014- Door Hardware," which included a more detailed description of Item No. 3 outlined in the USACE's October 11, 2012 letter regarding CT018. (Defendant Ex. 17, at 2; Doc. 127, at 254).

20. On November 27, 2012, Mar-Paul sent Change CT014-Door Hardware" to Butch-Kavitz, requesting a proposal from Butch-Kavitz for the electrical work associated with the required changes.

21. On January 17, 2013, Butch-Kavitz provided Mar-Paul with a proposal in the amount of $17,469.00, which included work associated with both Change CT018-DLA Security and IT Revisions and Change CT014- Door Hardware. Butch-Kavitz indicated that 12,000 feet of the wire and a portion of the labor would be required to complete CT014. (Defendant Ex. 17, at 2; Doc. 35, at 128). The remaining items identified in the proposal were associated with the work required for CT018. (Defendant Ex. 18).

22. That same day, Mar-Paul sent a proposal for Changes CT018 and CT014 to the USACE in the amount of $19,600.22, which accounted for Butch-Kavitz's $17,469.00 proposal, Mar-Paul's 10% markup for overhead, and the 2% markup for the bond. (Defendant Ex. 18, at 1).

23. On January 22, 2013, Mar-Paul sent Butch-Kavitz an e-mail confirming the conversation between Mar-Paul, Butch-Kavitz, and the USACE that occurred on January 18, 2013, with respect to Mar-Paul's January 17, 2013 proposal for the work associated with Changes CT014 and CT018. (Defendant Ex. 19, at 1). The e-mail reiterated that the USACE verbally approved Butch-Kavitz's proposed price for the

labor and 12,000 feet of wire for CT014. However, the e-mail indicated that the USACE requested supporting documentation with respect to the quantities of material needed for CT018 before it would prepare and issue a written modification to the Principal Contract. (Defendant Ex. 19, at 1).

24. Despite additional requests by Mar-Paul, Butch-Kavitz never provided the itemization of the material for Change CT018.

25. On May 7, 2013, Mar-Paul signed Modification No. P00006 issued by the USACE, which increased the amount of the Principal Contract by $11,600.00 in connection with Change CT014. $1,261.32 represented Mar-Paul's overhead and profit. (Defendant Ex. 28). Specifically, the USACE approved payment to Butch-Kavitz in the amount of $10,338.68 for CT014. (Doc. 35, at 141). However, no written Subcontract change order was executed by Mar-Paul and Butch-Kavitz.

26. With respect to CT018, the USACE verbally agreed to an increase in the amount of the Principal Contract by $4,000.00. $364.00 of that $4,000.00 represented Mar-Paul's overhead and profit. (Defendant Ex. 29; Doc. 35, at 143). The USACE did not issue a written amendment for this change. (Doc. 35, at 143).

27. Butch-Kavitz worked on the security wire change order from January 29, 2013, through January 31, 2013. However, Butch-Kavitz did not complete the work. (Doc. 35, at 136).[6]

---

[6] Butch-Kavitz testified at trial that he did the work with respect to CT014 and CT018. However, the Court finds credible the testimony of Robert Bamford, who stated at trial that Butch-Kavitz did not complete all of the work, "but he did the majority of it." (Doc. 36, at 44).

*(footnote continued on next page)*

     *c.  Three Phase Panel- Electrical Room Revisions*

28. On March 19, 2012, Butch-Kavitz informed Mar-Paul by e-mail that "the disconnect switches that are shown to be relocated are not wired according to the [NEC] code." (D Ex. 35). Butch-Kavitz recommended that "the existing 3[ ]phase[ ]208[ ]volt panel be replaced with a new panel with enough space for future and having a circuit breaker sized properly for each existing load." (Defendant Ex. 35).

29. On March 21, 2012, Mar-Paul incorporated Butch-Kavitz's e-mail into a Request for Information, labeled as RFI #38, which was submitted to the USACE for review and response. (Defendant Ex. 35).

30. In response to RFI #38, the USACE approved Butch-Kavitz's recommendation to replace the existing panel with a new 120/208V panel and authorized the deletion of the new disconnects from the Principal Contract.

31. On April 25, 2012, Butch-Kavitz submitted a cost estimate of $4.936.00 to replace the existing 3-phase 120/208V panel. (Defendant Ex. 36).

32. That same day, Mar-Paul submitted a proposal to the USACE for replacement of the existing panel in the amount of $5,773.75, which included Butch-Kavitz's estimate and Mar-Paul's markup for overhead, profit, and bond. (Defendant Ex. 36).

33. A more detailed itemization of the materials and labor needed to complete the installation of the new 120/208V panel was requested from Butch-Kavitz; however,

---

Specifically, he testified that there were a "couple doors that weren't wired, there was some trouble-shooting, there was some wiring - - it was shorted out, just wasn't r[u]n right, they had to do some corrected work." (Doc. 36, at 45).

Butch-Kavitz did not provide the requested itemization. As a result, Mar-Paul prepared a letter to the USACE dated September 27, 2012, providing a breakdown of the $4,936.00 estimate based on information it obtained from other sources. (Defendant Ex. 37).

34. The September 27, 2012 letter reflected the additional cost of the work as well as a credit for the materials not being used to relocate the disconnects as called for in the original drawing. (Defendant Ex. 37).

35. On February 21, 2014, Mar-Paul signed Modification No. P00007 issued by the USACE, which increased the amount of the Principal Contract by $5,200.00 to account for the electrical room revisions that were the subject of RFI #38. $500.00 of the $5,200.00 represented Mar-Paul's overhead and profit. (Defendant Ex. 39).

36. Butch-Kavitz did not perform any of the work that was the subject of RFI 38. (Doc. 35, at 154; Defendant Ex. 21).

    *d.   Deletion of Fiber Optic Cable*

37. On October 11, 2012, the USACE requested a proposal from Mar-Paul in "Change CT019" for eliminating the installation of certain fiber optic cable from the Principal Contract. (Defendant Ex. 31).

38. On July 17, 2012, Butch-Kavitz provided a cost estimate in the amount of $2,900.00 to delete the fiber optic cable work. According to Butch-Kavitz, $2,100.00 of the $2,900.00 cost estimate represented material and $800.00 represented labor. (Doc. 35, at 26).

39. On July 19, 2012, after receiving Butch-Kavitz's proposal, Mar-Paul requested a detailed itemization of the cost estimate, including an invoice for the cable, and a "better breakdown on labor" to provide to the USACE. (Defendant Ex. 30).

40. In response to that request, Butch-Kavitz provided the following information by e-mail to Mar-Paul: "Cable cost—2100.00 Labor cost 2 men 8 hours ea 800.00." (P Ex. 17). Butch-Kavitz did not furnish the invoice despite repeated additional requests to do so. (Defendant Ex. 30).

41. On March 29, 2013, Mar-Paul submitted a proposal to the USACE for the removal of the fiber optics cable installation from the Principal Contract. The proposal incorporated Butch-Kavitz's cost estimate, including the information provided by Butch-Kavitz in his July 19, 2012 e-mail to Mar-Paul, as well as a markup representing overhead and bond. (Plaintiff Ex. 18).

42. The USACE reasoned that it was entitled to a $7,000.00 credit for the deletion of the fire optic cable work because Butch-Kavitz did not include the labor for splicing the cable in its credit proposal. (Doc. 35, at 148). Specifically, the USACE believed that the proposal did not account for the additional cost of Butch-Kavitz having to hire a subcontractor to splice the fiber optic cable, as it "is not a simple task and an electrician is generally not qualified to splice fiber optic[ ] cable." (D Ex. 34). Butch-Kavitz was given the opportunity to respond to the USACE with respect to its cost estimate, but failed to do so. (Defendant Ex. 34). Nevertheless, Mar-Paul was able to negotiate the credit in the amount of $4,300.00. (Doc. 35, at 148).

IV.   **BUTCH-KAVITZ'S ADDITIONAL WORK CLAIMS**

      a.   *Electrical Demolition*

43.  In the fall of 2011, when Mar-Paul began interior demolition work, it realized that there was additional demolition work that was required but not reflected in the drawings.

44.  Mar-Paul submitted an RFI to the USACE requesting direction as to how to proceed with the unanticipated additional electrical demolition work. In response, the USACE requested a cost estimate for the additional electrical demolition work, and Mar-Paul, in turn, sought a proposal from Butch-Kavitz, which Butch-Kavitz provided on January 2, 2012 in the amount of $14,750.00. (Doc. 35, at 107-08).

45.  However, in October of 2011, prior to receiving the proposal from Butch-Kavitz, Mar-Paul began undertaking the demolition on its own to keep the Project moving forward.

46. Mar-Paul continued to perform the demolition through March 1, 2012.[7]

47. In March of 2013, Butch-Kavitz submitted a partial invoice in amount of $9,350.00, approximately one year after Mar-Paul finished the electrical demolition work, for

---

[7] The daily logs drafted by Robert DeGrazia, Mar-Paul's project site manager, on October 21, 2011, October 25, 2011, November 7, 2011, November 29, 2011, February 29, 2012, and March 1, 2012, as well as photographs of required demolition on the project site, reveal that Robert Degrazia undertook a substantial portion of the demolition work on his own, as the demolition needed to be done in order to avoid any further delay with respect to the Project. (Doc. 35, at 36).

demolition work it alleged it completed. This invoice contained no details as to the demolition allegedly completed by Butch-Kavitz. (Doc. 35, at 52).[8]

48. Mar-Paul did not authorize Butch-Kavitz to perform any additional electrical demolition work, as it did not receive a commitment from the USACE to pay for additional demolition work.[9]

   b. Air Handler Unit

49. Mar-Paul, on behalf of Butch-Kavitz, submitted RFI #72 to address whether the 60 AMP breaker was sufficient for two fans or whether two wires should be run to accommodate each fan. (Defendant Ex. 40).

50. In its response to RFI #72 dated November 19, 2012, the USACE directed Mar-Paul to proceed with the original design. It noted that the response should be taken as

---

[8]Butch-Kavitz offered no documentation at trial of the date, scope, location, labor or equipment used to complete the demolition. (Doc. 35, at 51).

[9] Robert DeGrazia testified as follows:

Q.   Did you ever tell Butch-Kavitz to go ahead and do any demolition work under this proposal?

A.   No. Well, let me correct that - - no, because it was all done by the time we got the change order approval.

. . .

Q.   Mr. Degrazia, you testified that even once Butch-Kavitz came on-site, you still did some electrical demolition work?

A.   That's correct.

Q.   Why?

A.   Because we didn't have an approved change order yet, and I'm not going to ask anybody to do work that I can't guarantee them payment for.

(Doc. 36, at 36; 61).

merely clarification of the Project at "no additional cost or time to the Government." However, it advised Mar-Paul to respond within ten (10) days if it disagreed with the response. (Defendant Ex. 40).

51. Mar-Paul faxed a copy of the response to Butch-Kavitz on November 26, 2012. Butch-Kavitz never communicated to Mar-Paul that it expected additional compensation for the work that was the subject of RFI #72. (Defendant Ex. 40).

52. On March 1, 2013, Butch-Kavitz submitted an invoice for $8,469.00, purportedly for work associated with the air handler unit. (Defendant Ex. 41).

53. Mar-Paul did not authorize Butch-Kavitz to perform any additional electrical demolition work with respect to the air handler unit, nor did it have knowledge that the air handler required additional work.[10]

## V.   KEY PAYMENT TERMS UNDER THE SUBCONTRACT AGREEMENT

54. Paragraph 6 of the Subcontract Agreement provides the following with respect to payment for work completed:

---

[10] At trial, Butch-Kavitz Jr., testified that the air handler feeders required additional work, as "the feeder that had been installed prior to the unit being supplied to the job was under size and also required an additional feeder, conduit, breaker, laborer, so on. It's above and beyond what was shown on the original drawing considerably." With this testimony in mind, the Court nevertheless finds credible the testimony of Robert Bamford, who testified to the following:

Q.   [D]id Butch-Kavitz ever communicate to you that they expected additional compensation for the work that's the subject of RFI 72?

A.   No.

(Doc. 35, at 49).

It appears that to the extent Butch-Kavitz preformed additional work with respect to the air handlers, beyond the scope of RFI 72, that work was not approved by Mar-Paul.

6.      **Progress and Final Payment**. Based upon the applications for payment submitted to Contractor by Subcontractor and ***subsequent to approval thereof by Contractor and Owner***, Contractor shall make periodic progress payments to Subcontractor, subject to the express condition precedent of payment therefor by Owner and within fifteen (15) days after receipt of such sums from Owner. Subcontractor shall submit its applications five (5) days prior to the date Contractor must submit its application for payment to Owner and, unless another form is specified, shall make its applications on the current version of AIA forms G702 and G703. If Subcontractor does not submit its application on time, Contractor shall have the right to withhold processing of the application until the next monthly billing cycle. ***Payments shall be in an amount in proportion to the amount of Work completed, less the percentage retained from payment by Owner to Contractor***, and less the aggregate of all payments to Subcontractor, and less any amount in Contractor's opinion relates to defective Work. Contractor shall make final payment to Subcontractor, subject to the express condition precedent of payment therefor by Owner and within fifteen (15) days after receipt of such funds from Owner; provided, however, Subcontractor's Work is fully performed in accordance with this Subcontract; subject to Contractor's review and approval; and provided Subcontractor shall have furnished Contractor with a release of all claims against contractor and Owner arising out of this Subcontract, a release of all liens, and, if applicable, insurance certificates pursuant to paragraph 9. . . . [11]

(Subcontract Agreement Ex. 5, at 4) (emphasis added).

55. Paragraph 3 of Attachment A, incorporated by reference into the Subcontract

Agreement, states the following with regard to progress payments:

3.      Subject to the provisions of the Contract Documents, the amount of each progress payment shall be based on:

(a) the total schedule of values of the work acceptably completed as approved by the Agency, Architect, Owner and any other necessary contract parties; plus

---

[11] In the present case, the contractual language specifically states that payment is "subject to the express condition precedent of payment therefor by Owner," thereby constituting a "pay-if-paid" clause. Nevertheless, the determination of whether the payment clause in the Subcontract Agreement creates a condition precedent is immaterial, as Mar-Paul is not invoking the clause as a defense to nonpayment.

(b) the value of materials and equipment delivered and suitably stored at the site that shall become part of the permanent structure within thirty (30) days after delivery; less

(c) ten percent (10%) of each payment request for a construction item shall be retained by the Contractor.

(Subcontract Agreement Ex. 5, at 14).

56. Pursuant to Paragraph 6 of the Subcontract Agreement, and Paragraph 3(a) of Attachment "A" of the Subcontract Agreement, the amount of each progress payment due to Butch-Kavitz was based on the amount of Work completed by Butch-Kavitz during any given billing period.

57. Pursuant to Paragraph 6 of the Subcontract Agreement, and Paragraph 3(a) of Attachment "A" of the Subcontract Agreement, the amount of Work completed by Butch-Kavitz for a given billing period was ultimately subject to approval by Mar-Paul and the USACE.

58. Pursuant to Paragraph 6 of the Subcontract Agreement, and Paragraph 3(a) of Attachment "A" of the Subcontract Agreement, Mar-Paul was entitled to a 10% retainage from each progress payment.

59. Mar-Paul's applications for payment to the USACE contained a schedule of values based on the activities in the construction schedule, each of which were assigned a cost value for purposes of determining the percentage of each activity that had been completed during each billing period, which, in turn, determined the amount of payment due for each activity.

60. A value was assigned to each activity. 100% of the values equaled the Subcontract Agreement price.

61. In preparing the first three applications for payment, Butch-Kavitz utilized the AIA forms required by the Subcontract Agreement. However, the itemization of each electrical activity did not match the electrical schedule of values contained within Mar-Paul's applications for payment to the USACE. (Defendant Ex. 46; 47; 48).

62. While Butch-Kavitz was not required to do so, it agreed to use a revised schedule of values prepared by Mar-Paul that matched the electrical schedule of values in Mar-Paul's applications for payment to the USACE. (Doc. 36, a 20).

63. Mar-Paul incorporated the percentage complete for each item of electrical work set forth in Butch-Kavitz's application for payment into the corresponding schedule of values in Mar-Paul's application for payment to the USACE for that month. Mar-Paul's practice was to submit a draft "pencil copy" of its application for payment to the USACE for approval. (Doc. 36, at 194).

64. A representative of the USACE would walk the Project site with Project Site Manager Bob DeGrazia each month and would inspect the physical work in place to verify whether the percentages of work complete contained within the application for payment were fair and accurate. When there was a disagreement as to the percentage of the work complete, they discussed it and came to an agreement. (Doc. 35, at 214).

65. The percentages agreed upon at the site inspection were then incorporated into a final draft of Mar-Paul's application for payment and submitted to the USACE for payment. (Doc. 35, at 207).

66. The USACE would approve and pay Mar-Paul's final application for payment each month. (Doc. 35, at 207).

17

67. Mar-Paul paid Butch-Kavitz an amount equal to the percentage of the electrical work approved by the USACE as complete during each billing period, less the retainage that the USACE withheld from Mar-Paul with respect to that application for payment. (Defendant Ex. 44). Using Mar-Paul's calculations from the progress payment invoices, the Court finds that the following payments were made based on the amount approved by the USACE:

68. On December 28, 2011, through Mar-Paul's payment requisition No. 1, the USACE approved $0 of Butch-Kavitz's work as complete. (Defendant Ex. 44). No payment was remitted to Butch-Kavitz for that billing cycle.

69. On February 10, 2012, through Mar-Paul's payment requisition No. 2, the USACE approved $58,711.50 of Butch-Kavitz's work as complete. That amount was adjusted to account for a 10% withheld retainage fee. On February 1, 2012, prior to receiving payment from the USACE for the work Butch-Kavitz completed for that billing cycle, Mar-Paul advanced funds to Butch-Kavitz by disbursing a check to Butch-Kavitz in the amount of $63,656.20, $4,944.70 more than what the USACE subsequently approved for that billing cycle. (Defendant Ex. 44).

70. On April 17, 2012, through Mar-Paul's payment requisition No. 4, the USACE approved $10,162.35 of Butch-Kavitz's work as complete, reflecting a 10% withheld retainage fee. However, on April 19, 2012, to account for Mar-Paul's overpayment of $4,944.70 on February 1, 2012, Mar-Paul paid Butch-Kavitz $5,025.50, leaving a balance of $192.15 owed to Butch-Kavitz.(Defendant Ex. 44).

71. On May 30, 2012, through Mar-Paul's payment requisition No. 5, the USACE approved $58,518.86 of Butch-Kavitz's work as complete, which included a 10%

reduction for retainage. That same day, Mar-Paul paid Butch-Kavitz $59,708.00, which included the $192.15 owed to Butch-Kavitz from the previous billing cycle. However, in doing so, Mar-Paul overpaid Butch-Kavitz by $996.99. (Defendant Ex. 44).

72. The payments made to Butch-Kavitz on July 12, 2012, August 15, 2012, September 18, 2012, and October 23, 2012, corresponded to the amounts approved by the USACE, which included the 10% retainage reduction. (Defendant Ex. 44).

73. On November 21, 2012, through Mar-Paul's payment requisition No. 10, the USACE approved $15,468.30 of Butch-Kavitz's work as complete, which incorporated the 10% retainage reduction. That same day, however, Mar-Paul paid Butch-Kavitz only $13,921.47 to account for Mar-Paul's overpayment of $996.99 on May 30, 2012, leaving a balance of $549.84 owed to Butch-Kavitz. (Defendant Ex. 44).

74. On January 10, 2013, through Mar-Paul's payment requisition No. 11, the USACE approved $58,518.11 of Butch-Kavitz's work as complete, which reflected a 10% reduction for retainage. On January 17, 2013, Mar-Paul paid Butch-Kavitz $67,746.44 to account for the remaining balance of $549.84 owed to Butch-Kavitz from the previous billing cycle. However, in doing so, Mar-Paul overpaid Butch-Kavitz by $8,678.49. (Defendant Ex. 44).

75. On February 22, 2013, through Mar-Paul's payment requisition No. 12, the USACE approved $52,518.11 of Butch-Kavitz's work up through January of 2013 as complete. On February 25, 2013, Mar-Paul submitted its last payment to Butch-Kavitz in the amount of $42,828.71, which accounted for the $8,678.49 overpayment

19

remaining from the previous billing cycle. However, in remitting this payment, Mar-Paul underpaid Butch-Kavitz by $549.84.[12]

76. Mar-Paul paid Butch-Kavitz a total of $402,004.68 for the work performed on the project. (Doc. 35, at 7).[13]

## VI.    DEFAULT OF SUBCONTRACT AGREEMENT

77. Paragraph 27 of the Subcontract Agreement provides:

> 27.    **Default.** In the event Subcontractor at any time does any of the following: fails in any respect to prosecute the work required hereunder; performs or fails to perform any of the covenants or agreements contained herein; becomes insolvent; makes an assignment for the benefit of creditors; or fails to make prompt payments to its laborers, materialmen, suppliers or Subcontractors; Contractor may, in addition to any other remedy under this Subcontract, at law or in equity: (a) perform and furnish through others all or any part of the Work remaining to be completed or (b) at its option, terminate the employment of the Subcontractor and complete the Work. Contractor may deduct from any unpaid balance due Subcontractor its expenses of completing the Work and such other costs and damages, including but not limited to legal fees and consultant, engineering, expert and testing fees and costs, as

---

[12] At trial, Butch-Kavitz sought to illustrate that Mar-Paul was consistently delinquent in making its progress payments through a ledger which purported to reflect the accrual of delinquencies by comparing payments made by Mar-Paul against Butch-Kavitz's net requests. However, this ledger distorts the nature of what Mar-Paul's payment obligations actually were under the Subcontract Agreement. Indeed, the discrepancies between what Butch-Kavitz billed and what it received from Mar-Paul do not account for the fact that the USACE frequently approved lesser amounts for payment on account of Butch-Kavitz's work, and further, do not include adjustments to account for the 10% retainage. (Doc. 35, at 55; Doc. 35, at 59).

[13] As of February 4, 2013, the last day Butch-Kavitz performed work on the Project site, the USACE had approved $381,206.27 of Butch-Kavitz's work as complete. However, Mar-Paul had received $350,503.63 from the USACE for Butch-Kavitz's work, as the USACE withheld retainage from Mar-Paul in the amount of $30,702.65. (Defendant Ex. 44). Nevertheless, Mar-Paul had paid Butch-Kavitz a total of $359,182.12, which was $8,678.49 more than Mar-Paul had received from the USACE for Butch-Kavitz's work. (Defendant Ex. 44).

Contractor may suffer as a result of Subcontractor's expense of completing the Work and other costs and damages over any unpaid balance due Subcontractor hereunder.

(Subcontract Agreement Ex. 5, at 10).

78. Thus, pursuant to Paragraph 27 of the Subcontract Agreement, a failure in any respect to prosecute the Work required under the Subcontract Agreement constitutes an event of default. (Subcontract Agreement Ex. 5, at 10).

79. February 4, 2013, was the last day Butch-Kavitz worked on the project site. Butch-Kavitz conceded at trial that it refused to return to the Project site to complete the remaining electrical and generator work required under the Subcontract Agreement, citing non-payment as its justification for terminating the Subcontract Agreement.[14]

## VII.   INCOMPLETE WORK

80. Pursuant to Paragraph 27 of the Subcontract Agreement, an act of default triggers a Contractor's right to "perform and furnish through others all or any part of the Work remaining to be completed . . ." and to "deduct from any unpaid balance due Subcontractor its expenses of completing the Work and such other costs and

---

[14] Butch-Kavitz testified as follows:

Q.    Did you ever go back and complete the other .01 percent?

A.    No, I never did.

Q.    Why was that?

A.    I was owed an amount of money that's astronomical, I mean, why am I - - I have to put a Band-Aid on something somewhere before my heart stops beating. That's why I didn't go back because I wasn't paid.

(Doc. 35, at 33-34).

damages . . . as Contractor may suffer as a result of Subcontractor's default." (Exhibit 5). Moreover, the Subcontractor "shall be liable for and shall pay upon demand any excess of Contractor's expense of completing the Work and other costs and damages over any unpaid balance due Subcontractor . . . ." (Subcontract Agreement Ex. 5).

    *a.*   <u>*TDME Restroom*</u>

81. At the time Butch-Kavitz abandoned the Project, the TMDE restroom was unfinished. Specifically, Butch-Kavitz did not complete the light fixtures, receptacles, heaters, main panel box, exterior lights, garage doors and fiber optic work for the TMDE restroom. (Doc. 41, at 9; Doc. 35, at 123).

82. Mar-Paul retained John P. Kearney & Associates, Inc., and CK Alarm Systems to complete the electrical finish work and fire alarm work for the TMDE restroom, at a cost of $26,333.31. (Defendant Ex. 43).

    *b.*   <u>*CT014 & CT018*</u>

83. Butch-Kavitz did not complete the security door wiring required by CT014 and CT018.

84. As a result, Mar-Paul contracted John P. Kearney & Associates, Inc. to complete the security door wiring work required by CT014 and CT018, at a cost of $8,562.20.

    *c.*   <u>*Electrical Room Revision Work*</u>

85. Butch Kavitz did not complete the electrical room revision work.

86. As a result, Mar-Paul solicited bids from three subcontractors to perform the electrical room revision work and ultimately retained Mark Whitehead Contractor, Inc., who submitted the lowest bid to complete the work. The work required working off hours

to remove the old electrical panel, remove the disconnects, and install the new electrical panel, at a cost of $22,786.39. (Doc. 36, at 47).[15]

    d. *Lighting Protection System*

87. Specification Section 26 41 01, labelled "Lighting Protection System" is a performance specification outlining the performance requirements for the lighting protection system. (Defendant Ex. 3).

88. By e-mail to Mar-Paul dated July 31, 2012, the USACE requested the lighting protection system submittal. (Defendant Ex. 43(1)).

89. By e-mail to Mar-Paul dated December 5, 2012, the USACE again noted that Mar-Paul had not provided the submittal for the lighting protection system and advised Mar-Paul that the USACE could withhold payment for failure to provide submittals. (Defendant Ex. 43(1)).

90. By e-mail to Butch-Kavitz dated January 17, 2013, Mar-Paul identified items of Butch-Kavitz's work that were not complete and asked for paperwork to substantiate

---

[15] According to Mar-Paul, Mark Whitehead's cost to perform the electrical room revision work in the amount of $22,786.39, is higher than Butch-Kavitz's $4,936.00 for the work, because Butch-Kavitz's proposal was reduced to reflect a credit in the amount of $2,278.45, which represented the cost to relocate the disconnects as was required under the original Subcontract Agreement prior to the change order. (Doc. 37). Mark Whitehead did not include such a credit in its price because it never had a pre-existing contractual obligation to relocate the disconnects. While the Court finds this incurred cost to be substantial, Butch-Kavitz did not present any arguments or proof at trial or in post-trial briefs challenging the reasonableness of those costs that Mar-Paul incurred with respect to this item. Moreover, Mar-Paul presented additional evidence that it mitigated its damages by choosing the lowest of the three solicited bids. (Defendant Ex. 33; Defendant Ex. 43).

Butch-Kavitz's position that the lighting protection system was not part of the Project. (Doc. 43(1)).

91. By letter to the USACE dated January 23, 2013, Butch-Kavitz informed the USACE that "[t]here is no drawing or sketch as to a Lighting Protection System for Building 12. Therefore a system could not be included in my electrical cost." (Defendant Ex. 43(1)).

92. By e-mail to Butch-Kavitz dated February 6, 2013, Mar-Paul notified Butch-Kavitz of items of electrical work that were still not complete and attached the USACE's list of deficiency items, including the lighting protection system." (Defendant Ex. 43(1)).

93. On March 12, 2013, Mar-Paul e-mailed Butch-Kavitz a list of outstanding items for the Project. (Defendant Ex. 42). Mar-Paul also notified Butch-Kavitz that it had contracted with a lighting protection installer, Larson Lighting Protection, in the amount of $16,570.00 to complete the task and such cost would be deducted from the Subcontract Agreement. (Defendant Ex. 43(1)).

94. On March 27, 2014, Mar-Paul sent Butch-Kavitz a letter that served as a demand for payment by Butch-Kavitz of costs that Mar-Paul incurred in excess of Butch-Kavitz's subcontract balance. (Defendant Ex. 43(1); Doc. 35, at 217).[16]

---

[16] The demand of $19,808.38 as stipulated in the March 27, 2014 letter was higher than the $17,000.00 claimed at trial. Mar-Paul testified at trial that the discrepancy involved a couple of invoices that were found to be only partly Butch-Kavitz's responsibility, so they were adjusted for what work was related to his contract. (Doc. 35, at 218).

e.  *Fire Alarm Panel*

95. All of the electrical and fire alarm drawings listed in the "Index of Drawings" are included in the scope of the Work of the Subcontract Agreement.

96. By e-mail to Butch-Kavitz dated March 7, 2013, Mar-Paul forwarded Butch-Kavitz a quote from Kinetix to provide bi-directional communication between the fire alarm panels at the Project, and informed Butch-Kavitz that such work needed to be completed. (Defendant Ex. 43(2)).

97. That same day, Butch-Kavitz responded to Mar-Paul, indicating agreement to Mar-Paul's proposition to contact Kinetix and arrange to have the fire alarm work completed. (Defendant Ex. 43(2)).

98. On March 15, 2013, Mar-Paul faxed a letter to Butch-Kavitz notifying Butch-Kavitz that the USACE had obtained a proposal from Kinetix to perform the work for $1,570.00 and that it would deduct that cost from the Subcontract Agreement. (Doc. 43(2)).

f.  *Amplifier*

99. By e-mail to Butch-Kavitz dated January 25, 2013, Mar-Paul provided a list of deficiency items, which included installation of the amplifier as required by the drawings incorporated by reference into the Subcontract Agreement. (Defendant Ex. 21; Doc. 35, at 133).

100.    Butch-Kavitz did not install the amplifier as required by the drawings. Thus, Mar-Paul purchased the amplifier from Cossa's Music for $350.00 and installed it. (Defendant Ex. 43(3); Doc. 35, at 175).

g.   _Splicing of Voice Cables_

101.    The scope of the Work under the Subcontract Agreement includes providing the interconnections necessary to provide a complete and operable telecommunications system as required by electrical drawing ES102 and Specifications Sections 33 82 00 Parts 1.4 and 3.1. This also includes splicing voice cables to run in the manholes so that the telephone system in Building 12 will be operable.

102.    Butch-Kavitz ran the voice cable in the manholes but never spliced/terminated the voice cable so that the telephone system in Building 12 was operable.

103.    By e-mail to Mar-Paul dated Mary 17, 2013, the USACE notified Mar-Paul that the voice cable needed to be spliced by May 31, 2013 so that the tenant would have full use of the facility and could conduct operations. (Defendant Ex. 43(4); Doc. 35, at 175).

104.    By letter dated May 23, 2013, the USACE notified Mar-Paul that the voice splicing work was required by drawing ES102 and Specification Section 22 82 00 in order to provide a complete and operable telecommunications system. (Defendant Ex. 43(4)).

105.    In response, Mar-Paul retained TEI to perform the voice cable splicing work, which cost Mar-Paul $2,304.44. (Defendant Ex. 43(4)).

106.    Mar-Paul also had to rent a pump to remove the water out of the manhole in order to allow TEI to safely perform the splicing work. The cost to rent the pump was $148.40. (Defendant Ex. 43(4)).

h.  *UPS relocation*

107.    Butch-Kavitz conceded at trial that the UPS system was part of the scope of the Work as envisioned by the Subcontract Agreement.

108.    The UPS system did not operate properly at the time Butch-Kavitz abandoned the Project. As a result, the USACE contacted Eaton Corp., the manufacturer of the unit, to service the unit. (Defendant Ex. 43(5); Doc. 35; at 177).

109.    Eaton was unable to service the UPS unit because Butch-Kavitz did not install the unit in the location shown on drawing EP101, "Electrical Power Plan." Specifically, Butch-Kavitz installed the unit in a location in a manner in which the access panel could not be opened. (Defendant Ex. 43(5); Doc. 35; at 177).

110.    Mar-Paul retained Mark Whitehead to relocate the UPS unit at a cost of $2,401.56. (Defendant Ex. 43(5)).

111.    Once the UPS system was relocated, Eaton returned to the Project site to service the UPS system, as it was defective. Eaton submitted an invoice to Mar-Paul in the amount of $5,303.92 for those repairs. (Defendant Ex. 43(5)).

i.  *Training*

112.    Specification Section 26 32 14, Part 3.8 and 28 31 64 requires training manuals for the fire alarm system and the generator.

113.    The USACE would not permit the required systems training to be conducted until all paperwork, such as O&M manuals, were submitted. (Defendant Ex. 43(6)).

114.     Despite demands by Mar-Paul, Butch-Kavitz never provided all of the O&M manuals required by the USACE, which prevented the training for the fire alarm systems and generator from taking place. (Defendant Ex. 43(6)).

115.    By letter dated May 16, 2014, Mar-Paul notified Butch-Kavitz that it would seek to recover the cost to complete the training from Butch-Kavitz. (Defendant Ex. 43(6)).

116.    Mar-Paul retained Kinetix and Winter Engine-Generator Service Inc. to provide the training for the fire alarm system and the generator, at a cost of $125.00 and $631.76 respectively. (Defendant Ex. 43(6)).

   *j.    Data Wire Outlet*

117.    Drawing ET101 n. 13 and n. 14, entitled "Telecommunications Plan," include installation of video cables in the conference and multipurpose room.

118.    Butch-Kavitz never installed the voice cables in the conference or multipurpose rooms. (Doc. 35, at 183).

119.    By e-mail dated October 2013, the USACE requested an update on the installation of the cables. (Defendant Ex. 43(7)).

120.    Mar-Paul purchased the materials for the work at a cost of $237.86 and installed the voice cables in the conference room and multipurpose room. Mar-Paul only deducted the material cost from the Subcontract Agreement. (Defendant Ex. 43(7)).

## CONCLUSIONS OF LAW

The Court has jurisdiction over the instant action under the Miller Act, 40 U.S.C. § 3131, *et. seq.* and has supplemental jurisdiction over the parties' state law claims. *See* 28 U.S.C. § 1367; *Lyon v. Whisman,* 45 F.3d 758, 759–61 (3d Cir. 1995). Venue is proper in this Court, as the suit has been brought in the District where the Project was located. 28 U.S.C. § 1391(b); 40 U.S.C. § 3133(b)(3)(B). In actions brought under the Miller Act, issues not involving the

construction of the Act are resolved by the law of the state where the contract is performed. *U.S. ex. rel. Greenville Equip. Co., Inc. v. U.S. Cas. Co.,* 218 F.Supp. 653, 657 (D. Del. 1962). Thus, Pennsylvania substantive law applies to the non-Miller Act claims.

To reiterate, Butch-Kavitz argues that it is entitled to breach of contract damages as well as interest, penalty and attorney's fees pursuant to the Pennsylvania Contractor and Subcontractor Payment Act.

## I.   BREACH OF CONTRACT

1. Butch-Kavitz contends that Mar-Paul breached the Subcontract Agreement by failing to make complete progress payments in the amounts Butch-Kavitz billed for each month.[17] It further argues that it is entitled to payment for the additional work it completed with respect to demolition and the air handler. "To establish a breach of contract under Pennsylvania law, the party alleging the breach must establish the following: (1) the existence of a contract, including its essential terms; (2) the breach of a duty imposed by the contract; and (3) damages." *U.S. ex rel. Greenmoor, Inc. v. Travelers Cas. & Sur. Co. of Am.*, No. CIV. A. 06-CV-0234, 2009 WL 4730233, at *49 (W.D. Pa. Dec. 4, 2009)(citing *Church v. Tentarelli,* 953 A.2d 804, 808 (Pa. Super. Ct. 2008), *appeal denied,* 960 A.2d 835 (Pa. 2008)).

---

[17] At trial, Butch-Kavitz objected to any testimony with regard to the payment terms in the contract between Mar-Paul and the USACE. Specifically, he argued that the "pay-if-paid" provision in the Subcontract, conditioning payment to the subcontractor on receipt of payment by the USACE, was void pursuant to the Miller Act. This argument however, is irrelevant to the matter at hand, as Mar-Paul has not asserted that this clause is a defense to liability on the payment bond.

a. *Oral Agreement—Additional Demolition and Air handler*

2. Parties to a contract may waive the requirements of the contract by subsequent oral agreement or conduct, notwithstanding a contractual provision providing that modifications must be in writing. Indeed, "[c]onstruction contracts typically provide that the builder will not be paid for extra work unless it is done pursuant to a written change order, yet courts frequently hold that owners must pay for extra work done at their oral direction." *Universal Builders, Inc. v. Moon Motor Lodge, Inc.,* 244 A.2d 10, 15 (Pa. 1968)

3. "This liability can be based on several theories. For example, the extra work may be said to have been done under an oral agreement separate from the written contract and not containing the requirement of a written authorization. . . . The requirement of a written authorization may also be considered a condition which has been waived." *Universal Builders, Inc.* 244 A.2d at 15 (citations omitted).

4. "[T]he effectiveness of a non-written modification in spite of a contract condition that modification must be written depends upon whether enforcement of the condition is or is not barred by equitable considerations, not upon the technicality of whether the condition was or was not expressly waived before the non-written modification." *Universal Builders, Inc.,* 244 A.2d at 15.

5. "In view of these equitable considerations underlying waiver, it should be obvious that when an owner requests a builder to do extra work, promises to pay for it and watches it performed knowing that it is not authorized in writing, he cannot refuse to pay on the ground that there was no written change order." *Universal Builders, Inc.*, 244 A.2d at 16 (citation omitted).

6.  Here, the Court finds that Butch-Kavitz has failed to meet its burden of producing evidence demonstrating that Mar-Paul directed Butch-Kavitz to perform additional demolition or make additional changes with respect to the air handler. Rather, the evidence reveals that Mar-Paul completed any additional demolition beyond the scope of Butch-Kavitz's Subcontract Agreement, and further, was unaware of any changes made with respect to the air handler. Moreover, it would be in Mar-Paul's best interest to forward any cost proposals from Butch-Kavitz to the USACE, as Mar-Paul would be entitled to a 10% markup for overhead and profit. Accordingly, Butch-Kavitz is not entitled to compensation for the work it allegedly completed with respect to additional demolition or the air handler.

   b.  *Essential Terms—Adjusted Subcontract Price*

7.  The parties do not dispute that an agreement existed between Mar-Paul and Butch-Kavitz to execute changes and additions to the Work with respect to the TMDE Restroom, CT014, CT018, and the 3 phase cable/electrical room revisions. Indeed, the parties merely dispute the amounts charged for those items. However, Paragraph 15(a) of the Subcontract Agreement stipulates that if any change is made and directed by the USACE, the amount of the adjustment to the Subcontract price for additional work will be the same as the USACE adds to the price of the Principal Contract, excluding such sum as the USACE may have included or added for Mar-Paul's overhead and profit. Since the changes to CT014, CT018, and the 3 phase cable/electrical revision were made pursuant to the change order provisions of the Principal Contract, Paragraph 15(a) of the Subcontract Agreement limits the amounts of the adjustment to the Subcontract Price for the additional work involved in those

31

changes. Accordingly, Butch-Kavitz is not entitled to an increase in the Subcontract

Price for the full amount of its proposals. Butch-Kavitz is only entitled to the amount

that the USACE increased the Principal Contract less Mar-Paul's overhead and profit.

8. The Court finds that the adjusted Subcontract Agreement price totals $485,004.68.

The breakdown of that cost is as follows:

| | |
|---|---|
| **Original Subcontract Price:** | $452,000.00 |
| **Modifications:** | |
| TMDE Restroom Addition: | $18,630.00 |
| CT014: | $10,338.68 |
| CT018: | $3,636.00 |
| Three Phase Panel/<br>Electrical Room Revisions: | $4,700.00 |
| Deletion of Fiber Optic Cable: | ($4,300.00)[18] |
| **Adjusted Subcontract Price:** | **$485,004.68.** |

c. *Breach Imposed by Subcontract*:

9. Under Pennsylvania law, nonperformance of a duty under a contract is a breach. *Oak*

*Ridge Constr. Co. v. Tolley,* 504 A.2d 1343, 1348 (Pa. Super. Ct. 1985); Restatement

_____

[18] The deletion of the fiber optic cable is also subject to Paragraph 15(a) of the Subcontract
Agreement. Indeed, pursuant to Paragraph 15(a), "omitted work shall be the same as Owner
deducts from Contractor's price for the Work Subcontractor was directed to omit . . . ."
(Subcontract Agreement Ex. 5, at 8). While Butch-Kavitz proposed a credit of $2,900.00 for
the deleted fiber optic cable work, it is subject to the negotiated credit amount of $4,300.00 as
approved by the USACE. Accordingly, $4,300.00 is the amount of the adjustment to the
Subcontract Price for the fiber optic cable.

(Second) of Contracts § 235(2) (1981). However, "[a]lthough any contractual default may be considered a breach, it is only when the breach constitutes a material failure that the non-breaching party is discharged from all further obligations under the contract and is free to terminate the contract." *Tyro Industries, Inc. v. Trevose Constr. Co.,* 737 F. Supp. 856, 864 (E.D. Pa. 1990) (citing *Oak Ridge Constr. Co.* 504 A.2d at 1348; Restatement (Second) of Contracts §§ 235(a), 237 (1981)).

10. Five factors are considered when determining whether a breach is material: "(a) extent to which the injured party will be deprived of the expected benefit; (b) extent to which injured party can be adequately compensated for the part of the benefit of which he was deprived; (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture; (d) likelihood that the party failing to perform will cure his failure; (e) extent to which the behavior of the party failing to perform or to offer to perform comports with standard of good faith and fair dealing." *U.S. For Use & Ben. of Joseph P. Sulzbach, Inc. v. Cottman Mech. Contractors, Inc.*, No. CIV. A. 92-4378, 1993 WL 533114, at *3 (E.D. Pa. Dec. 23, 1993) (citing *Tyro Indus., Inc. v. Trevose Constr. Co. ,* 737 F. Supp. 856, 864 (E.D. Pa. 1990) (citations omitted)).

11. Moreover, the party alleging the breach must "prove that he has performed all of his own obligations under the contract." *Trumbull Corp. v. Boss Constr., Inc.,* 801 A.2d 1289, 1292 (Pa. Commw. Ct. 2002).

12. The Court finds that Mar-Paul's negligible underpayments to Butch-Kavitz in the amounts of $192.15 on April 19, 2012, and by $549.84 on November 21, 2012, did not constitute a breach "so substantial" as to justify Butch-Kavitz's abandonment of its contractual obligations pursuant to the Subcontract Agreement, especially where, as

33

here, Mar-Paul tendered the amount necessary to cure the delinquencies at the time the next progress payment was due. *U. S. for Use & Benefit of Carpet Boutique, Inc. v. Aetna Ins. Co.*, No. CIV.A. 85-1470, 1986 WL 15026, at *15 (E.D. Pa. Dec. 23, 1986)(citing *U. S. for Use & Benefit of Aucoin Elec. Supply Co. v. Safeco Ins. Co. of Am.*, 555 F.2d 535, 541 (5th Cir. 1977) (nonpayment of progress payment is not breach unless it stops work); *U. S. for Use of Bldg. Rentals Corp. v. W. Cas. & Sur. Co.*, 498 F.2d 335, 340 (9th Cir. 1974)(slight deviation in time or amount of progress payment will not excuse performance)).

13. In contrast, the party claiming the breach does not have a right to suspend performance of a contract if the breach is not material. *Widmer Eng'g, Inc. v. Dufalla*, 837 A.2d 459, 468 (2003). As Mar-Paul did not materially breach the Subcontract Agreement, Butch-Kavitz was not relieved of its duty to perform.

14. Butch-Kavitz's failure to prosecute its Work under the Subcontract Agreement after February 4, 2013, constituted an act of default pursuant to Paragraph 27 or the Subcontract Agreement. Thus, the clear language of the Subcontract Agreement entitles Mar-Paul to recover the cost of completing the remaining work and any overages incurred.

   d. *Damages:*

15. It is a well-settled principal of contract law that a party asserting the breach "has the burden of proving damages resulting from the breach." *Spang & Co. v. U.S. Steel Corp.*, 545 A.2d 861, 866 (Pa. 1988). Damages are "not recoverable if they are too speculative, vague or contingent and are not recoverable for any loss beyond an

34

amount that the evidence permits to be established with reasonable certainty." *Spang & Co.*, 545 A.2d at 866.

16. "The law does not require mathematical precision when calculating damages." *E. Coast Paving & Sealcoating, Inc. v. N. Allegheny Sch. Dist.*, 111 A.3d 220, 233 (Pa. Commw. Ct. 2015). Indeed, "if the facts afford a reasonably fair basis for calculating how much [a party] is entitled to[,] such evidence cannot be regarded as legally insufficient to support a claim for compensation." *Lach v. Fleth*, 64 A.2d 821, 827 (Pa. 1949).

17. The proper measure of damages in a case where the subcontractor walked off the job after completing only a portion of the work required by its agreement is the difference between the contract price and cost of completing the work left undone. Stated differently, damages are calculated as the difference between the amount remaining due and owing under the Subcontract Agreement and the actual cost of completing the work required by the Subcontract. *Douglass v. Licciardi Const. Co.*, 562 A.2d 913, 916 (1989) (citing *Ecksel v. Orleans Constr. Co.,* 519 A.2d 1021 (Pa. Super. Ct. 1987); *Steinhauer v. Wilson,* 85 A.2d 477 (Pa. Super. Ct. 1984); *Brourman v. Bova,* 182 A.2d 245 (Pa. Super. Ct. 1962)).

18. No proof was submitted by Butch-Kavitz to counter Mar-Paul's assessment of the cost of completion.[19] Indeed, Butch-Kavitz did not present evidence that the invoices

---

[19] Butch-Kavitz argues that many of the items Mar-Paul completed, including the Lighting Protection System, as well as the Powell pump connection, the voice cables in manhole, the fire alarm system, and the lighting suppression system, were for "extra work that [he] should

*(footnote continued on next page)*

submitted by the parties hired to complete the work were unreasonable, or that Mar-Paul could have had the work finished at a lower rate. Here, Mar-Paul has clearly established that: (1) Butch-Kavitz abandoned the job site on February 4, 2013 and as a result, Mar-Paul was required to hire other companies to complete the work; (2) the amount of work was necessary to complete the Subcontract; and (3) pursuant to Paragraph 27 of the Subcontract Agreement, Mar-Paul may deduct from any unpaid balance due to Butch-Kavitz its expenses of completing the Work and demand any excess of its expenses of completing the Work over any unpaid balance due Butch-Kavitz. Accordingly, the Court finds that Mar-Paul has met its legal burden by establishing the existence of damages and proving facts and circumstances that permit a probable estimate of the amount of damages or loss sustained. The calculation of damages owed to Mar-Paul is as follows:

| | |
|---|---|
| **Adjusted Subcontract Price:** | $485,004.68 |
| | (--) |
| **Amount Paid to Butch-Kavitz:** | $402,010.85 |
| | |
| **Unpaid Subcontract Price:** | **$82,993.83** |

**Cost To Complete Subcontract Agreement:**

| | |
|---|---|
| TMDE Restroom Addition: | $26,333.31 |
| CT014 & CT018: | $8,562.20 |

---

have been doing above and beyond the contract price." (Doc. 35, at 36). However, the unambiguous terms of the Subcontract Agreement, which incorporate by reference all specifications and drawings included in the Principal Contract, provide that the Subcontract Agreement includes these items.

| | |
|---|---|
| Three Phase Panel/ Electrical Room Revisions: | $22,786.39 |
| Lighting Protection System: | $16,570.00 |
| Fire Alarm Panel: | $1,570.00 |
| Amplifier: | $350.00 |
| Splicing of Voice Cables: | $2,304.44 |
| Pump: | $148.40 |
| UPS Relocation: | $2,401.56 |
| UPS Repairs (Eaton): | $5,303.92 |
| Training: | $756.76 |
| Data Wire Outlet: | $237.86 |
| **Cost to Complete Work:** | **$87,324.84** |
| 10% overhead: | $8,732.48[20] |
| 5% profit: | $4,366.24 |
| Total: | $100,423.56 (--) |
| Unpaid Subcontract Price: | $82,993.83 |

**Total Amount Owed to Mar-Paul:**       **$17,429.73**

---

[20] While Butch-Kavitz does not contest the cost of overhead, the Court notes that it does not appear that Mar-Paul included the overhead in hiring replacement subcontractors. Thus, it is reasonable that Mar-Paul included its standard 10% mark-up for overhead in its cost to complete figures. *See LBL Skysystems (USA), Inc. v. APG-Am., Inc.,* No. CIV.A.02-5379, 2006 WL 2590497, at *27 (E.D. Pa. Sept. 6, 2006).

## II.   PENNSYLVANIA CONTRACTOR & SUBCONTRACTOR PAYMENT ACT

19. Butch-Kavitz also argues that it is entitled to recovery of a penalty, interest, and
attorney's fees pursuant to the Pennsylvania Contractor & Subcontractor Payment
Act, 73 P.S. § 501 *et seq.* (the "Act"), purportedly for Mar-Paul's failure to make
interim progress payments in accordance with Butch-Kavitz's submitted invoices.

20. Section 504 of the Act provides that "performance by a contractor or subcontractor in
accordance with the provisions of a contract shall entitle the contractor or
subcontractor to payment from the party with whom the contractor or subcontractor
has contracted." 73 P.S. § 504. The Act also requires that once the subcontractor has
performed in accordance with the contract, the contractor must pay the subcontractor
"the full or proportional amount received for [the] subcontractor's work and materials,
based on work completed or services provided under the subcontract," either: (1) "14
days after receipt of each progress or final payment [from the owner];" or (2) "14 days
after receipt of the subcontractor's invoice, whichever is later." 73 P.S. § 507(c). If a
contractor violates the Act, a subcontractor may recover interest of one percent per
month of the amount wrongfully withheld, and "the substantially prevailing party in
any proceeding to recover any payment . . . shall be awarded a reasonable attorney
fee." 73 P.S. § 512.

21. As determined above, Butch-Kavitz stopped work on the project on February 4, 2013,
prior to completing its work, which was an act of default under Paragraph 27 of the

38

Subcontract Agreement.[21] Thus, Butch-Kavitz did not perform in accordance with the terms of the Subcontract Agreement. Furthermore, this Court has previously determined that Mar-Paul did not breach its payment obligations under the Subcontract, as it made complete payments to Butch-Kavitz for the work Butch-Kavitz completed. Thus, Mar-Paul is not liable under the Act.

## CONCLUSION

For the foregoing reasons, this Court concludes that Mar-Paul did not breach the Subcontract Agreement with respect its progress payment obligations. Furthermore, the Court concludes that Butch-Kavitz's abandonment of the project site on February 4, 2013 was a clear act of default pursuant to Paragraph 27 of the Subcontract Agreement and thus, Mar-Paul is entitled to recover the costs of completing the project. Accordingly, Butch-Kavitz is not entitled to recover: on its breach of contract claim; under the Miller Act bond issued by Western Surety Company; or under the Contractor and Subcontractor Payment Act. Rather, Mar-Paul is entitled to judgment in its favor on its counterclaim in the amount of $17,429.73.[22]

---

[21] To the extent that Butch-Kavitz intended to argue that Mar-Paul failed to make timely progress payments, it failed to prove as much at trial, and as such, this Court cannot assess interest or penalties from any untimely interim payments.

[22] This calculation does not include the attorney's fees. The Court will address attorney's fees in a separate order.

An appropriate Order shall follow.


**Dated: December 1, 2015**                    *s/ Karoline Mehalchick*
                                               **KAROLINE MEHALCHICK**
                                               **United States Magistrate Judge**